KT Corporation v. ABS Good morning and may it please the Court. Paul Werner on behalf of KTSAT. KTSAT seeks to vacate commercial arbitration awards that conflict with and compel the violation of direct orders of the South Korean government. Those orders, carried out through Korea's executive agencies and its courts, held the parties' attempted sale of a strategic asset, a space launch and flight vehicle, and satellite with high-performance telecommunications transponders, violated multiple laws, including, critically, the Nation's Foreign Trade Act. Those agencies rendered the transaction null and void, they imposed corrective actions on KTSAT, and they levied criminal sanctions against key executives involved in the deal. Have we heard anything from the State Department or the Korean government itself with regard to this? No, Your Honor. There is nothing on the record from either our State Department or the government of Korea. However, Korea has acted through the MSIP with the two orders that it issued. It also acted through its Ministry of Trade, known as MOTI, in designating the space vehicle a strategic asset. You know, this is one of the problems with the briefs, frankly, to be honest with you. I've been doing this 16 years. I did a little law before that, but this is my first satellite case. And it's hard to put this all in the context. You don't give us an overarching context of what kind of regulatory schemes there are, international conventions. It's not here in the briefs. We have no kind of, we have no roadmap of what the overarching legal structure is that regulates this kind of activity. We know that there was a department, the U.S. Department of State approved this, allowed it, said it was okay. And so obviously there is some governmental involvement. And we know that the Korean government began to object two to three years after the fact, even though it obviously knew about it for some time prior to that. And then we're, frankly, we're confronted with a problem of your own making, with all due respect to you, because at page 611 of the appendix, your predecessor specifically suggested that perhaps the legitimacy of the administrative agency's determination in Korea should not be determined in a Korean court, where I would think we would have to really think about comedy issues, but that it should be submitted to the arbitrators. Isn't that a problem of your own making? Haven't you put yourself on the wrong ship already? No, no, Your Honor. With respect to the letter, that's at 611. We take a different understanding of the letter. The letter is that the commercial dispute, it's resolved in an arbitral forum. The arbitral forum is not. Well, let me read to you, I mean, I, the letter says, we are of the view that the validity of the purchase contract is the subject matter to be conclusively determined by the arbitration proceedings between KTSAT and APS and not in any lawsuit filed by KTSAT with an administrative court in Korea. Your Honor. But now you come here and you tell us that the arbitration violates issues of comedy with regard to Korea. We think you just protest too much. Your Honor, the arbitration was to decide the validity of the contract in light of Koreans' actions. And then the letter, interestingly, the letter goes on to say, it's a terrific letter. It says, with respect to the remaining MSIP orders, we are also of the view that challenging such orders through legal action would not be in the best interest of either KTSAT or ABS. And then it goes on and says, give us back the satellite. You give us back the satellite and then we'll work it out with Korea. Well, I can understand why ABS wasn't so interested in giving you back the satellite. Your Honor, notwithstanding what the letter says. Notwithstanding what the letter says. The letter cannot change the scope of the party's arbitration agreement as set forth in the operations agreement and the purchase contract. So when one party says to another party who is talking about arbitration, let's put this issue before the arbitrator, that party reserves their right later on to say it was beyond the arbitrator's authority to make a decision. The very decision that they asked for. Your Honor. Don't you think that one party could rely upon the representations of another? Yes, Your Honor. With respect to 611, though, we take a different understanding of that letter. Okay. We do not think that the parties ever agreed to submit the validity of Korea's governmental actions to arbitration. And that's further reinforced by what actually went on at the arbitration. Take a step back. ABS also requested that you appeal the MSIP order, right? Didn't they request that? And you said, no, we're not appealing it? They did request that. We did say no because there was no chance of success on an appeal. MSIP orders have never been appealed. There's nothing in the record to suggest there's ever been an appeal of an MSIP order ever, let alone one that's been successful. Our strategy was to – Isn't this kind of a unique situation where you had two satellites that were approved, the same type of satellites, and the third one required no approval, right? And then the third one requires approval? There was no notice of the transaction to the MSIP. That's why the enforcement action did not come until later when it became a political issue within Korea. Government agencies stepped in at that point. There was no notice to ABS that they were going to issue this ruling either, right? Did ABS have any knowledge that this ruling was going to come out? Yes. It did have notice that the ruling was going to come out. It participated through Korean counsel in the MSI proceedings, and I direct your attention to page 865 of the appendix where ABS, in its briefing, discusses all that it did to convince the MSIP not to unwind the party's transaction and to allow ABS to continue to operate. The arbitration panel concluded that even assuming the order is mandatory law, it was concerned about the retroactivity issue and said that the order couldn't be applied retroactively in this context. Was that a crazy decision by the arbitrators? It certainly wasn't an issue that was put before the arbitrator to resolve. It wasn't briefed. It wasn't submitted. It wasn't teed up. The order comes two years after the transaction, and it's now being used to undermine the transaction after the fact. Yes, Your Honor, except the law that's been issued. What was the obligation? Was it to get the approval, assuming approval was required? There are approval requirements on both sides. There's no question that there was an obligation for KTSAT to obtain approval, but if you look at section 5 of the operation agreement, both KTSAT and ABS were under obligations to comply with any regulatory authorities and obtain any required permission. It was AT's obligation to obtain this approval. You're conceding that. It was, and it didn't. It didn't. Yeah. Go ahead. If I may, the validity of the order was never put to the tribunal in any respect. There was no discussion of ex post facto or anything else, but to answer your earlier question, the law that the agency applied, the Foreign Trade Act, was on the books, as were the regulations requiring a permit for a satellite like this. They were on the books before the parties undertook their transaction, so there was really no ex post application of the law here, even if that were an issue that were ever submitted to the arbitration tribunal, which it wasn't. Can you explain what the difference was between this satellite and the other two satellites? What was the difference that generated the different outcome? Well, enforcement authorities pick and choose when they're going to enforce laws. They did here. They didn't enforce it against the prior satellite. They chose to enforce it here. They have to make discretionary choices, and that shouldn't really matter. Can you explain that decision? I'm sorry? Can you explain that decision, what the distinction was? I know you're saying they have, you know, this is their decision-making prerogative, but can you explain it? For whatever reason, they didn't take action against KS-2. They only took action against KS-3. KS-3 was the one that was transferred and caused a political firestorm. That's when the regulators stepped in. They opted at that time, although I will point out that MOTI, in fact, in its ruling regarding permits, references KS-2 as well as KS-3, not just KS-3, and that's at 549 of the appendix. Thank you. You've saved some time. We'll hear from the other side. Good morning. May it please the Court. I am Michael Nolan from Milbank for Appley ABS. Let me begin by addressing a well-taken criticism from Judge Wesley that I think was directed to us as well. You said that a problem with the briefs. I keep wondering what it is that Korea can and can't do right now. The satellite has a relationship to telecommunications capabilities, and it occupies a slot that's identified for the Republic of South Korea. I know that there's a U.N. accord because it's mentioned very briefly in your papers, but I have no idea how all this fits in the broader scheme of things. These are geosynchronous satellites, and I know that my Fitbit can tell me wherever I am on a given morning in Central Park within 40 feet because of those things. It makes me feel a little nervous at times, but it gives me some comfort also. I never feel lost. But the fact of the matter is, is that there's a lot of ‑‑ I have a sense that there's an awful lot of law out there that you didn't tell us about, and I appreciate page size issues, but where does this fit? You were able to buy it. You had to get some government approvals. Then did you have unlimited control of it? Well, I think an answer that I can give you that I really think is a good answer, although not a very satisfying one, is that these subject matters were extensively dealt with in an arbitration proceeding. And I went for literally for five years, and it is very challenging because I take your criticism because what we're listening to are factual arguments in the papers and the oral submissions. Some of those factual arguments are arguments that were made in the arbitration. With respect, I would say they must be very difficult for you to follow. This isn't my first satellite case, and it is still very difficult for me to deal with the subject matter of the satellites. And then you add the overlay here, which my friend Mr. Warner described at the hearing as a political firestorm in Korea. So all of the ordinary politics and conventions are part of that political firestorm. This resulted in enormous focus by the tribunal on things like this. There's something called the International Telephony Union, which regulates frequency allocation. That is one part of an international regulation. There were extensive submissions. There were expert submissions, several of them on each side, on some of these very questions. So it's very difficult in this appellate context to address the substance of what was really the subject of the arbitration. And we also have extensive factual arguments being made now that are really in contradiction to the arguments that K.T. was making during the arbitration. So I – I take the case as I get it, but my only context – law firms as sophisticated as both of yours have enormous reach-out capabilities to amici. Amici briefs here would have helped enormously putting this into the context, because I have a feeling this happens, that there are these kinds of commercial disputes more often than not, or that they happen with some frequency. And so, therefore, I'm here sitting doing New York law and arbitration awards, and I'm wondering about, you know, I don't want to mess things up, but right now I've got the law that I need to deal with and I'll take care of it. One last thing. Has the – I take it your view, you mentioned in your brief, their expert didn't agree or couldn't render a conclusion as to whether MSIP had jurisdiction to really intervene in this matter in any event. Is that correct? Well, yeah. I mean, I think there are two important points about their own experts. I'm going to ask your opponent about that. That relate to this question. The issue – the issue of the application of the FTA, right, the Foreign Trade Act, in the question of permitted approval. Their expert took the position, and I believe it was also the stated position acknowledged by KT during the arbitration, that that was a MOTI function, not an MSIP function. MSIP is involved in the question of frequency use. The real dispute in this arbitration was not – was the fact that MSIP directed that the satellite could no longer be used consistent with the frequency allocations to serve the business of ABS. MOTI is the entity that has responsibility for administering the FTA permits, didn't require them with respect to the earlier satellites. MOTI has never spoken to this at all. Now, there's also reference to criminal actions against certain individuals of – at MSIP – at KT in connection with all of this. It's really not clear what those actions were for. It's not clear whether they were contested. It's not clear whether there was a plea bargain element. There were fines directed against those individuals. Now, if you look back, and I know I'm bouncing a bit, but if you look back to focus on your question of the requirement of FTA approvals or licenses, the Korean law, which is not really very well developed in the sense that none of this was actually done domestically in Korea, calls for penalties, not for there to be nullifications of contracts or anything like that. Financial penalties. None of this was dealt with in Korea. Now, we wrote early in this – in this dispute, we wrote them and we said, you have a right to seek court review. That right was not availed upon by KT. We asked for it, and you've read through the letters, so I will not belabor it. But this was an unusual circumstance, okay? These were highly politicized matters. This was just when the sequence of events, and some of them directly relate to KT, that resulted in then-President Park's impeachment conviction, and she's now serving 30 years in prison. ABS matter, or KT matters, are actually part of those impeachment charges. This was highly politicized. So to say there haven't been instances of MSIP orders being, you know, successfully challenged in the Korean courts, that may be true. But what MSIP is doing is fundamentally dealing with technical questions of frequency allocation. The entity that is actually responsible for foreign trade, right, Modi, is really a stranger to all of this and never spoke to or addressed any of it. So I really do not mean to fend off the criticism in terms of how much is unclear to you about the satellite industry, the business and its regulation in these papers. I believe that to be the case. I stand convicted in that respect. These papers do not help you fully to understand this subject matter in the way I think you would need to if you were deciding this case is an original matter. But you're not. That's why we had the arbitration proceedings that we had. And I think what you should take comfort in is really two things fundamentally. First is Judge Schofield's very careful treatment of these subject matters. And she finds that we easily meet the standards that are, of course, very allowing. And I won't take your time with my telling you about the standards that are applied in reviewing an arbitration award. But I will say that the tribunal that we had in the arbitration was as distinguished a tribunal as you can have in matters of international commercial disputes, and particularly with respect to these subject matters. Our designated arbitrator, Dan Price, was a senior U.S. official with respect to trade matters in the second Bush administration, enormously accomplished in this area, one of the most prominent arbitrators who sits in these sorts of cases. That same sort of reputation applies with respect to each of the two other individuals. There were multiple hearings in this case. Those hearings all involved the tribunal's submission to the parties of requests prior to those hearings of the issues that were to be decided and briefed and orally dealt with at those hearings, precisely because this is a difficult subject matter. And that is a process that operated in the way that it should. Ultimately, you had a very, a very meaningful, substantial dissent, 30 single-spaced pages that focuses on one aspect of this. You read the dissent and the majority opinion together. There's an interplay on all of the questions. This is not, it's apparent on the face of it. This isn't an award that was written and then there's a dissent. There were multiple drafts exchanged. You can see a discussion between the arbitrators. In this context, even to invoke in this very general way this manifest disregard language, it's sort of saying we're going to re-argue the points of the arbitration. And if we are so right that we appear to be manifestly right, right, then we somehow are entitled to vacatur. That has nothing to do with what manifest disregard and vacatur means as a matter of New York law. And I know that all of you understand that better than I do. I won't submit to that. But I will say that the sort of interplay that you see on this very distinguished tribunal should really give you comfort that even in the absence of the kind of detailed understanding that you would want to have as a trier of fact, the process worked as the parties agreed in the arbitration clause. And because the process worked, this award should be confirmed. The vacatur application should be dismissed. And we should finally reach a point where ABS receives the damages that have been held up in all of this process. And we should bring this to an end. Thank you. Thank you. We'll hear the rebuttal. Judge Wesley, just to return to your question about the regulatory structure, just to be clear, the International Telecommunications Union is the body that carves up the real estate in outer space and allocates it to nation states. Nation states take their slots and regulate them as they see fit. In the United States, it's the Federal Communications Commission. In Korea, it's the MSIP. The sale and transfer of satellites are subject to a separate regulatory regime, which is carried out here in the United States through ITAR, which is carried out in Korea through the Federal Foreign Trade Act. The orders here, this Court's case law, the Supreme Court case law, all of the relevant precedent makes clear that this Court is not to reexamine a valid action of a foreign government under the comity. So ultimately ---- But you have administrative agencies. Those cases are judgments of foreign governments or foreign courts. Here you have an administrative agency decision after the fact, two years after the fact, and you refuse to challenge it in court. So aren't all those cases distinguishable? No, I don't think so, Your Honor. The government here acted through an executive agency. The cases which date all the way back to the early 1800s involve all kinds of government actions from all kinds of questionable governments. They're far more questionable than the Republic of Korea here. Administrative agency in any foreign government can start invalidating transactions that have already taken place with regard to title passing. They can undo arbitration agreements. Our government does that through CFIUS and other regulatory schemes. If they're not apprised of a transaction, our government would not hesitate to step in and unwind it. And here it was the appropriate action because the government never had notice of the transaction. So it's not unusual or remarkable that a regulator would have to step in after the fact. And that does happen. And we cite some of those occasions in our brief. But that doesn't undermine the validity of the order. It doesn't matter that when they asked you to challenge this, you refused to do so? That shouldn't play into the calculus at all? It doesn't make the governmental action any less valid. And importantly, one thing I just want to emphasize is the tribunal here relied on the government's orders. There were two awards. There was a partial award and then a final award. It held it didn't need to apply the order when it came to assigning title. And then it actually quoted from and applied the order in order to hold KTSAT in breach and award damages and find that ABS undertook reasonable mitigation. So it's not as if there were any finding, as in the Telenor case, where the government action was invalid. But in any other case where this Court or others have had to confront a foreign order, they have always recognized the foreign order. Thank you. Thank you. Thank you both. We'll reserve the decision. They were good briefs. And I didn't want you to both think that I found them disappointing. It was just a suggestion that it might be helpful in the future. That's all. I don't want some poor associate to go home and get bagged for this. All right. Thank you. We'll hear the next case. Hernandez, Chicago.